UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 7 2004

Michael N. Milby
Clerk of Court

MARIA DE JESUS CASTILLO DE ROMO        )

v.                                     )

TOM RIDGE, and MARC MOORE,             )
    U.S. DEPT OF HOMELAND SECURITY, and )
THE UNITED STATES OF AMERICA.          )
_____)

B-04-099

POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

EXHIBITS:

Exhibit C consists of "Respondent's Brief on Appeal, Request for Three-member Panel, and Motion to Terminate," filed with the BIA; Exhibit D consists of the Declaration of Guadalupe Hernandez, in support of her pending petition for habeas corpus in state court.

Respectfully Submitted,

Lisa S. Brodyaga, Attorney
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226
(956) 421-3423 (fax)
Fed. ID.  1178
Texas Bar 03052800

CERTIFICATE OF SERVICE

I, Lisa S. Brodyaga, certify that a courtesy copy of the foregoing, with exhibit, was personally delivered to the office of Steven Schammel, AUSA, at Brownsville, Texas, this 17th day of June, 2004.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


MARIA DE JESUS CASTILLO DE ROMO                )

v.                                              )

TOM RIDGE, and MARC MOORE,                      )
      U.S. DEPT OF HOMELAND SECURITY, and       )
THE UNITED STATES OF AMERICA.                   )
_____)


EXHIBIT "C" IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BEFORE THE IMMIGRATION JUDGE**

**In re**

**MARIA DE JESUS CASTILLO-ZAPATA DE ROMO**
**A37 837 447**

**RESPONDENT'S BRIEF ON APPEAL, REQUEST FOR THREE-MEMBER PANEL,**
**AND MOTION TO TERMINATE**

Respondent, by and through the undersigned, herewith files her appellate brief, in support of contention that, under *INS v. St. Cyr,* 533 U.S. 289 (2001)*,* and consistent with *Moosa v. INS,* 171 F.3d 994 (5th Cir. 1999), she is not removable as charged, and the proceedings should be terminated. Notwithstanding that she was innocent of the charges, she agreed to the plea bargain offered by the prosecutor, in reliance on the advice of counsel that, pursuant to *Martinez-Montoya v. INS,* 904 F.2d 1018, 1020 (5th Cir. 1990), deferred adjudication was not a conviction for immigration purposes. Under these circumstances, *St. Cyr* mandates that new legislation only be applied if there is no other possible interpretation of the retroactivity provisions, and such an alternate interpretation exists herein. Further, *Moosa* specifically reserved decision on the issue of whether its holding would apply where there had been actual, (and reasonable), reliance on *Martinez-Montoya,* such as occurred herein. In neither *Moosa*, nor *Matter of Punu,* 22 I&N Dec. 224 (BIA 1999), did the immigrant make a serious attempt to challenge the applicability of §322(c) of IIRIRA, which governs retroactivity in such cases. And finally, both were decided before *St. Cyr* articulated a standard even higher than "plain meaning" for finding retroactive application.

Ms. Romo also requests that the instant case be referred to a three-member panel, pursuant to 8 C.F.R. §1003.1(e)(6). The case at bar meets the following criteria:

(ii) The need to establish a precedent construing the meaning of laws, regulations, or procedures;

(iii) The need to review a decision by an immigration judge or the Service that is not in conformity with the law or with applicable precedents;

(iv) The need to resolve a case or controversy of major national import; ...

(vi) The need to reverse the decision of an immigration judge or the Service, other than a reversal under [8 C.F.R. §1003.1(e)(5)].

As outlined above, and more fully discussed below, following *St. Cyr*, there is a need to establish a precedent regarding the standard for retroactive application of new legislation, particularly with respect to §322(c) of IIRIRA. Because said section cannot be constitutionally applied to Ms. Romo, and because there exists an alternate construction, the decision of the Immigration Judge herein is not in conformity with the law. The issue is one of major national import, and the decision of the Immigration Judge must be reversed, and proceedings terminated.

## I. BACKGROUND

On or about May 14, 1996, Ms. Romo, a lawful permanent resident since 1982, accepted a plea bargain, under which she was to plead guilty, and be placed under deferred adjudication, in exchange for the withdrawal of various motions filed on her behalf. As she explained in her declaration under penalty of perjury: [1]

> I am a native and citizen of Mexico. I became a lawful permanent resident of the United States on November 4, 1982, at the age of eighteen. At that time, I came with my parents and siblings. I am now married, and with my husband, also an permanent resident, I have three children born in the United States. Apart from the

---

[1] A copy is attached hereto and incorporated by reference as Respondent's Exhibit B. *See also,* Exhibit A, the declaration of the criminal defense attorney who represented her at the time.

2

proceedings at issue herein, I have no criminal record. I only went through the fourth grade of school, in Mexico, and have devoted myself to my family.

On or about August 10, 1993, I was arrested, with my sister Guadalupe Hernandez, when marijuana was discovered secreted in the car in which I was a passenger. The car belonged to Jesus Flores, a friend of my sister. Mr. Flores was not in the vehicle at the time. On the day in question, my sister had asked me to accompany her to Houston. I asked my husband, who was against it, and he said "no." So I told her "no." She also asked our other sister, who also turned her down. But that afternoon, after my husband had gone to work, she came by the house, and made another attempt to convince me. I told her that I did not have any money, and she said that did not matter, as we were just going to go for the evening, and then come right back. I noticed that she was driving a different car, and asked whose it was. She said it belonged to a friend. I asked where her car was, and she said she had left it at the house. But it did not occur to me that there was anything wrong, and I did not ask any more questions about it. It all happened too fast. Since I do not have a driver's license, and rarely get out of the house, I finally agreed, essentially on a whim. I took a change of clothing, and the children, and we left. I did not even leave a note for my husband.

In Refugio, we were pulled over by the police because my sister did not have her seat belt fastened. The police had a drug-sniffing canine, and as soon as they opened the car door, the dog signaled that there was something in the car. Apparently, they found marijuana secreted somewhere in the vehicle. This was the first I knew, or even suspected, that there were drugs in the car. My sister and I were both arrested. Her daughter, who was about seventeen, was taken to a hotel, and left with my children. The police called my husband. He had come home, and discovered that we were gone. He was very angry, both with me, and with my sister.

My husband arranged to get me out on bond. He also found an attorney to represent me, Ricardo Alanis. After we had made a couple of trips to Refugio, Mr. Alanis negotiated a plea bargain, and recommended that I take

3

it. I had never been in trouble before, and did not know how the system worked. I do not even remember him telling me that I could go to trial. I trusted the attorney, and did what he said. He assured me that if I complied with the terms of my probation, the charges would be dismissed, my record would be clean, and that I would not have any more problems as a result of the incident. He did not warn me that Congress could make changes to the immigration law which could make this grounds for deportation, and that such changes could be made retroactive. Nor did he advise me that Congress was in the process of making such changes. Even though he knew that I was completely innocent, Mr. Alanis advised me to accept the plea bargain offered by the District Attorney. I believed what he had told me, and agreed to say that I was guilty, even though we both knew that was not true, just to be certain that I did not have any future problems.

Therefore, on May 14, 1996, I went to Court, with my attorney. I entered a plea of guilty, and was placed on probation for ten years. To date I have fulfilled all the conditions of my probation. At one point, when my sister and I reported to the Probation Office, the Officer asked my sister how much I was to be paid for my role in the offense. My sister replied: "Nothing, because she didn't know the drugs were there." I believe that the Officer made a note of this comment in her file.

In August of 1997, when I went to report to the Probation Officer, agents from INS were there. I was very surprised, because the attorney had assured me that I would not have any problems, so long as I fulfilled my probation requirements. But there was nothing I could do. The INS agents originally told me that they were going to send me to Mexico, but I protested, because of my children. Eventually, they took me to Harlingen, where they asked me a lot of questions, took away my green card, and gave me a "permiso." They told me that I would get a letter in the mail, setting a date for me to go to an Immigration Judge. But years went by, with no letter. I kept reporting to Immigration, and they kept extending my "permiso." Eventually, I received the appointment, and after a couple of appearances with the Immigration Judge, he ordered my deportation to Mexico.

4

An effort to have the Judgment vacated is underway.  [2]  However, Ms. Romo asserts that, notwithstanding the new definition of "conviction," (enacted after she accepted her plea bargain), she is not subject to removal. In *Moosa, id.* at 1009, the Court made the following pertinent observation (internal citations omitted):

> Next, Moosa asserts that applying the new definition of "conviction" to him presents retroactivity concerns because it increases his liability for past conduct. He asserts that he agreed to the deferred adjudication plea agreement "with an entirely different understanding of the immigration consequences of his plea". This assertion is not borne out by the facts. When Moosa entered into the plea agreement in January 1990, Martinez-Montoya had not been issued and Matter of M (a 1989 decision) was still the law. It was not until July 1990, several months after Moosa pled guilty, that Martinez-Montoya was decided. In short, the current definition of conviction is, in fact, the same as the definition when Moosa pled guilty. In any event, "it is well settled that Congress has the authority to make past criminal activity a new ground for deportation". ...

Ms. Romo asserts that the instant case does not fall under the authorities cited by the *Moosa* Court in support of the proposition that "it is well settled that Congress has the authority to make past criminal activity a new ground for deportation," and that this phrase is *dicta* in the context of the case in which it was uttered.

Moreover, in *INS v. St. Cyr, supra,* the Supreme Court articulated

---

[2]   However, in a recent case, *e.g., In re Gaona-Romero*, A74 700 798, the Board held that *Renteria-Gonzalez v. INS*, 322 F.3d 804 (5th Cir. 2002), which it characterized as "indicating that vacated federal and state convictions remain valid for purposes of immigration laws irrespective of the reasons why the conviction was vacated, was binding on the BIA in the Fifth Circuit, and overrode *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), which concluded that convictions vacated on the basis of a procedural or substantive defect were not convictions for immigration purposes.

a new, more stringent, standard for finding Congressional intent to apply a deportation statute retroactively where it would have genuine retroactive impact. Under *St. Cyr,* and consistent with *Moosa,* Ms. Romo insists that she is not subject to removal, regardless of whether she is ultimately able to get the Judgment set aside, on the grounds of ineffective assistance of counsel. *See, e.g., Ex Parte Elizondo*, 947 S.W.2d 202 (TxCrimApp. 1996) (actual innocense is basis for habeas corpus: Due Process forbids incarceration of innocent person).

The statutory change under which Ms. Romo is alleged to be subject to removal does not make "past criminal activity" grounds for removal. Rather, it changes the definition of conviction. Indeed, an examination of that statute indicates that it was not intended to apply to persons such as she, precisely because the disposition was not, at the time, a "conviction." She also argues that a contrary result would be unconstitutional, and that, as a result, the Board is obliged to seek an interpretation of the statute which would avoid the serious constitutional problems posed herein.

## II.   LEGAL BACKGROUND

In June 2001, the Supreme Court issued a trio of decisions, *INS v. St. Cyr,* 121 S.Ct. 2271 (2001); *Calcano-Martinez v. INS,* 121 S.Ct. 2268 (2001), and *Zadvydas v. Davis,* 121 S.Ct. 2491 (2001), which modify certain principles of law upon which *Moosa* and *Punu* were based. Said cases are therefore only controlling to the extent they are consistent with the later pronouncements of the Supreme Court.

## III.   ISSUES PRESENTED

A.   APPLYING 8 U.S.C. §1101(a)(48)(A) HEREIN WOULD CREATE SERIOUS CONSTITUTIONAL PROBLEMS, AND IT IS THEREFORE INCUMBENT ON THE BOARD TO ADOPT ANY REASONABLY PLAUSIBLE INTERPRETATION OF SAID PROVISION WHICH DOES NOT RENDER IT CONSTITUTIONALLY INFIRM AS APPLIED.

6

B.  A REASONABLE INTERPRETATION EXISTS OF 8 U.S.C. §1101(a)(48)(a) WHICH AVOIDS THE CONSTITUTIONAL ISSUES OTHERWISE RAISED HEREIN, IN THAT UNDER THE HEIGHTENED CLARITY REQUIREMENT OF *INS v. ST. CYR, SUPRA*, THERE EXISTS SUFFICIENT AMBIGUITY IN §322(c) OF IIRIRA TO TRIGGER THE *LANDGRAF* RETROACTIVITY ANALYSIS, WHICH, IN TURN, PRECLUDES APPLICATION OF THE NEW DEFINITION OF "CONVICTION" HEREIN, INSOFAR AS IT WOULD HAVE GENUINE RETROACTIVE EFFECT.

C.  IN THE ALTERNATIVE, WHERE THERE IS NO "RATIONAL LEGISLATIVE PURPOSE" FOR SUCH RETROACTIVE APPLICATION, AND WHERE RESPONDENT RELIED ON THE FACT THAT DEFERRED ADJUDICATION WAS NOT A CONVICTION FOR IMMIGRATION PURPOSES IT WOULD VIOLATE DUE PROCESS TO APPLY THE NEW DEFINITION OF "CONVICTION" RETROACTIVELY.

D.  IT WOULD VIOLATE BOTH SUBSTANTIVE AND PROCEDURAL DUE PROCESS TO CONCLUDE THAT RESPONDENT IS BOTH SUBJECT TO REMOVAL, AND INELIGIBLE FOR ANY FORM OF DISCRETIONARY RELIEF.

1.  WHEN MS. ROMO PLED NO CONTEST, IN EXCHANGE FOR DEFERRED ADJUDICATION, THIS DISPOSITION CARRIED NO IMMIGRATION CONSEQUENCES, AND IT VIOLATES SUBSTANTIVE DUE PROCESS TO RETROACTIVELY APPLY A NEW STATUTE, UNDER WHICH DEPORTATION BECOMES A MANDATORY CONSEQUENCE OF HER PLEA.

2.  IF APPLIED TO RENDER MS. ROMO SUBJECT TO REMOVAL, WITH NO POSSIBILITY OF DISCRETIONARY RELIEF, OR OF EVER RETURNING LAWFULLY TO THIS COUNTRY, §1101(a)(48)(A) WOULD ALSO VIOLATE PROCEDURAL DUE PROCESS.

E.  AN ALTERNATE CONSTRUCTION WOULD RENDER 8 U.S.C. §1101(a)(48)(A) AND §1227(a)(2)(A)(iii) VOID FOR VAGUENESS.

F.  IN THE FURTHER ALTERNATIVE, RESPONDENT MUST BE ALLOWED TO APPLY FOR §212(c) RELIEF, PURSUANT TO *INS v. ST. CYR, SUPRA*.

### IV.  ARGUMENT

**A.  APPLYING 8 U.S.C. §1101(a)(48)(A) HEREIN WOULD CREATE SERIOUS CONSTITUTIONAL PROBLEMS, AND IT IS THEREFORE INCUMBENT ON THE BOARD TO ADOPT ANY REASONABLY PLAUSIBLE INTERPRETATION OF SAID PROVISION WHICH DOES NOT RENDER IT CONSTITUTIONALLY INFIRM AS APPLIED.**

The existence of serious constitutional problems mandates that the Court seek a construction of the statute which would avoid them. *Webster v. Reproductive Health Services*, 492 U.S. 490, 562 (1989) (where fairly possible, statutes must be construed to avoid serious constitutional problems); *INS v. Cardoza-Fonseca,* 94 L.Ed2d 434,459

7

(1987) (reaffirming "the long-standing principle of construing any lingering ambiguities in deportation statutes in favor of the alien."). *See also, Zadvydas*, wherein the Court read a "reasonable time" limitation into INS' authority to detain former LPRs whose deportation orders could not be promptly effectuated. As the Court reasoned, *id.* at 2498 (some internal citations omitted):

> "[I]t is a cardinal principle" of statutory interpretation, however, that when an Act of Congress raises "a serious doubt" as to its constitutionality, "this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." ... We have read significant limitations into other immigration statutes in order to avoid their constitutional invalidation. See United States v. Witkovich, 353 U.S. 194, 195, 202, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957) (construing a grant of authority to the Attorney General to ask aliens whatever questions he "deem [s] fit and proper" as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue"). For *similar reasons, we read an implicit limitation into the* statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal- period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention.

Applying §1101(a)(48)(A), as interpreted in *Punu,* would raise grave constitutional concerns. Moreover, the statutory argument pressed herein has not been addressed by any Court, or by the Board. Particularly given the new test of *St. Cyr, supra,* it is urged that the BIA revisit the issue of whether §1101(a)(48)(A) does, or can constitutionally be applied, [3] to a disposition which was not a

---

[3] *See, e.g., U.S. v. Ubaldo-Figueroa,* 2003 U.S.App LEXIS 21026 (9th Cir. 10/17/03) (finding Due Process concerns in retroactive application of IIRIRA §321(b), even where disposition was unquestionably a "conviction" prior to IIRIRA).

8

"conviction" at the time it was entered.  As is shown below, the
construction urged herein is not only possible, but, it is urged,
is actually mandated by the plain language of IIRIRA §322(c).

**B.   UNDER THE HEIGHTENED CLARITY REQUIREMENT OF *INS v. ST. CYR, SUPRA*, THERE EXISTS SUFFICIENT AMBIGUITY IN §322(c) OF IIRIRA TO TRIGGER THE *LANDGRAF* RETROACTIVITY ANALYSIS, WHICH, IN TURN, PRECLUDES APPLICATION OF THE NEW DEFINITION OF "CONVICTION" HEREIN, INSOFAR AS IT WOULD HAVE GENUINE RETROACTIVE EFFECT.**

In *INS v. St. Cyr, supra,* the Supreme Court applied a heightened
clarity standard for determining whether a deportation statute is
sufficiently vague to trigger retroactivity analysis under *Landgraf
v. USI Films,* 511 U.S. 244 (1994).  As the Court noted, 121 S.Ct.
at 2279 (internal citations omitted) (footnote in original):

> First, as a general matter, when a particular
> interpretation of a statute invokes the outer limits of
> Congress' power, we expect a clear indication that
> Congress intended that result. ...   Second, if an
> otherwise acceptable construction of a statute would
> raise serious constitutional problems, and where an
> alternative interpretation of the statute is "fairly
> possible," ... we are obligated to construe the statute
> to avoid such problems. ...

These principles also apply to the Department of Justice.  As the
Fifth Circuit reminded the Government in *Loa-Herrera v. Trominski,*
231 F.3d 984, 991 (5th Cir. 2000) (footnote in original):

> [W]e note that the executive branch... has an independent
> duty to uphold the Constitution, irrespective of whether
> its actions are subject to judicial review.

*See also, Matter of Rojas,* I.D. 3451, 23 I&N Dec. 117 (BIA 2001),
Board Member Lory Rosenberg, dissenting: [4]

---

[4]   The Supreme Court cited Board Member Rosenberg's reliance
argument in *St. Cyr, id.* at 2292 (Footnote 51 omitted):

> Relying upon settled practice, the advice of counsel, and
> perhaps even assurances in open court that the entry of

> As I noted in my dissenting opinion in *Matter of Valdez*,
> 21 I. & N. Dec. 703 (BIA 1997), the canons of statutory
> construction militate in favor of a restrictive
> interpretation of a statutory provision "'if a broader
> meaning would generate constitutional doubts.'".

As is more fully discussed below, to the extent IIRIRA §322(c) is ambiguous, the reasons for favoring the interpretation urged by the Respondent herein are at least as compelling as those which the Supreme Court faced in *St. Cyr*. Furthermore, under the *Landgraf* analysis, it is obvious that the retroactive impact is far greater. In *St. Cyr,* the change was from possible deportation to mandatory deportation. Here, it is from no immigration consequences to mandatory deportation. Therefore, under *St. Cyr,* which was decided *after* the pertinent decisions of the BIA and Fifth Circuit herein, the new definition of "conviction" cannot be applied to Ms. Romo.

----

> the plea would not foreclose § 212(c) relief, a great
> number of defendants in Jideonwo's and St. Cyr's position
> agreed to plead guilty.... Now that prosecutors have
> received the benefit of these plea agreements, agreements
> that were likely facilitated by the aliens' belief in
> their continued eligibility for § 212(c) relief, it would
> surely be contrary to "familiar considerations of fair
> notice, reasonable reliance, and settled expectations,"
> ... to hold that IIRIRA's subsequent restrictions deprive
> them of any possibility of such relief. [FN52]

> FN52. The significance of that reliance is obvious to
> those who have participated in the exercise of the
> discretion that was previously available to delegates of
> the Attorney General under § 212(c).  See *In re Soriano,*
> 16 Immig. Rptr. B1-227, B1-238 to B1-239 (BIA 1996) (Lory
> D. Rosenberg, Board Member, concurring and dissenting)
> ("I find compelling policy and practical reasons to go
> beyond such a limited interpretation as the one the
> majority proposes in this case.  All of these people,
> and no doubt many others, had settled expectations to
> which they conformed their conduct").

1. **SECTION 322(c) OF IIRIRA, ESTABLISHING THE EFFECTIVE DATE FOR §1101(a)(48)(A), IS AT LEAST AS AMBIGUOUS AS THE PROVISIONS EXAMINED IN *ST. CYR*.**

In *St. Cyr,* INS claimed, *id.,* 121 S.Ct. at 2287 that:

> [T]he statute unambiguously communicates Congress' intent to apply the provisions of IIRIRA's Title III-A to all removals initiated after the effective date of the statute, and, in any event, its provisions only operate prospectively and not retrospectively.

But the Supreme Court found their arguments unconvincing. *Id.* at pp. 2287-2293. As the Court first noted, *id.* at 2288:

> The standard for finding such unambiguous direction is a demanding one. "[C]ases where this Court has found truly 'retroactive' effect adequately authorized by statute have involved statutory language that was so clear that it could sustain only one interpretation." *Lindh v. Murphy,* 521 U.S. 320, 328, n. 4 ... (1997).

The "sustain[s] only one interpretation" test of *St. Cyr* requires a higher degree of clarity than the "plain language" standard of review. [5] This "heightened level of clarity ... is required only to justify the *retroactive* application of a newly enacted provision." *Salahuddin v. Mead,* 174 F.3d 271,275 (2nd Cir. 1999). [6]

In the case at bar, as in *St. Cyr,* it is submitted that the statute **can** sustain more than one interpretation, and that the interpretation urged by Respondent conforms to the plain language of IIRIRA §322(c). IIRIRA §322(a)(1) defined, for the first time, the meaning of the term "conviction," to be codified at 8 U.S.C. §1101(a)(48)(A). It also enacted a new section, codified at §1101(a)(48)(B), which provides as follows:

---

[5] *See, Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984).

[6] *See also, In re Hanserd,* 123 F.3d 922,934 (6th Cir. 1997)

11

(B)    Any reference to a term of imprisonment or a
sentence with respect to an offense is deemed to include
the period of incarceration or confinement ordered by a
court of law regardless of any suspension of the
imposition or execution of that imprisonment or sentence
in whole or in part.

IIRIRA §322(a)(2) contains certain conforming amendments, to 8
U.S.C. §1101(a)(43)(F), (G), (N) and (P), and to §1182(a)(2)(B).
In other words, IIRIRA §322(a) includes not only the new definition
of "conviction," but also makes substantive modifications to the
manner in which terms of imprisonment and sentences are evaluated,
as well as a number of conforming amendments.  The effective date
for IIRIRA §322(a), including all of its subparts, is established
by §322(c), which provides as follows (emphasis added):

Effective Date. - The amendments made by subsection (a)
shall apply *to convictions and sentences* entered before,
on, or after the date of the enactment of this Act. ...

It is respectfully submitted that the "deferred adjudication"
disposition at issue herein is not a "conviction[] ... entered
before... the date of the enactment of this Act."

First, while the term "conviction" had not been defined prior to
IIRIRA, the Fifth Circuit had previously held that a Texas deferred
adjudication was not a conviction for immigration purposes.
*Martinez-Montoya, supra* at 1026 ("We therefore hold that Martinez-
Montoya has not been convicted within the meaning of section 245A
of the IRCA because he has not waived or exhausted his direct
appeals, nor has the appeals period lapsed.").  Thus it is beyond
question that prior to IIRIRA, deferred adjudication was **not** a
conviction.  Consequently, it was not a "conviction[] ... entered
before... the date of the enactment of this Act." If it was not a
conviction before the enactment of IIRIRA, it cannot be a
conviction entered before its enactment. To conclude otherwise

would be to indulge in "boot-strapping," or circular reasoning. [7]

The circular aspect of this reasoning distinguishes the instant case from *Mohammed v. Ashcroft*, 261 F.3d 1244 (11th Cir. 2001), retroactively characterizing a pre-IIRIRA **conviction** as an "aggravated felony." The Eleventh Circuit held that the language of that statute met the Supreme Court's "sustain only one interpretation" test. There, Congress had provided, *id*. at 1249-50:

> Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph.

Since the offense in that case *was* a "conviction" prior to the enactment of IIRIRA, this retroactivity language could sustain only one interpretation: it was an "aggravated felony" thereafter.

Nor does the interpretation urged herein read the retroactivity provisions out of the statute. Because §322(a) contains multiple provisions, specifying that the amendments enacted therein apply to "convictions and sentences entered before... enactment" reaches offenses which would not be included, if §322(c) specified only that it applied to "sentences" entered prior to IIRIRA.

---

[7]    *See, e.g., U.S. v. Ridlehuber*, 11 F.3d 516, 524 (5th Cir. 1993) ("...Rule 404(b) prevents the government from bootstrapping evidence into this case."); and *Hays County Guardian v. Supple*, 969 F.2d 111,117 (5th Cir. 1992) ("Government property, however, does not automatically cease to be a designated public forum because the government restricts some speech on the property. Otherwise, the restriction of speech on government property would be self-justifying. The restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech. The Supreme Court has not adopted such circular reasoning.").

Consider, for example, an immigrant with two prior misdemeanor DWI convictions, convicted of felony DWI in 1995. Assume that he was given a five year, suspended sentence, and placed on probation. In short, all three convictions, as well as the five year (suspended) sentence, occurred prior to the enactment of IIRIRA.

Prior to IIRIRA, §1182(a)(2)(B) rendered excludable (inadmissible):

> Any alien convicted of 2 or more offenses ... for which the aggregate sentences to confinement actually imposed were 5 years or more."

As a result of the amendments enacted by §322(a)(2)(B) of IIRIRA, §1182(a)(2)(B) now renders inadmissible any alien:

> convicted of 2 or more offenses ... for which the aggregate sentences to confinement were 5 years or more.

Prior to IIRIRA, our hypothetical immigrant was therefore clearly not excludable. And if IIRIRA §322(c) specified only that the amendments of §322(a) applied to "sentences" which pre-dated IIRIRA, (rather than "convictions and sentences"), the retroactivity clause "could sustain [more than] one interpretation." Specifically, it could have been plausibly argued that §1182(a)(2)(B) rendered immigrants excludable based on certain **convictions**, and that because Congress did not specify that the amendments of IIRIRA §322(a) applied to **convictions** which pre-dated IIRIRA, Congress did not intend that it apply to pre-IIRIRA **convictions**, regardless of when the *sentences* were imposed. Moreover, §322(c) also clearly applies to immigrants such as in *Mohammed v. Ashcroft,* whose criminal disposition clearly *was* a conviction entered prior to IIRIRA.

In *Moosa v. INS, supra*, the Court concluded that IIRIRA §322(a) did apply retroactively. However, Moosa "[did] not contest that the

14

plain language of § 322(c) mandates retroactive application," *id.,* at 497, and therefore he did not show that the interpretation urged herein would *not* "read its retroactivity provision out of the statute," *id.* Furthermore, the Court utilized the "plain language" standard, rather than the "heightened level of clarity," and thus neither considered the circular aspect of its reasoning, nor examined whether any other interpretation was possible, as is required under *St. Cyr.*

### 2. APPLICATION OF THE NEW DEFINITION OF CONVICTION TO MS. ROMO WOULD HAVE GENUINE RETROACTIVE EFFECT.

Even more importantly, as shown above, the Court in *Moosa* left open the question of whether the new definition could be applied retroactively where, as here, the plea agreement was made in reliance on its prior decision in *Martinez-Montoya. Moosa, supra,* 171 F.3d at 497:

> Next, Moosa asserts that applying the new definition of "conviction" to him presents retroactivity concerns... He asserts that he agreed to the deferred adjudication plea agreement "with an entirely different understanding of the immigration consequences of his plea". This assertion is not borne out by the facts. When Moosa entered into the plea agreement in January 1990, Martinez-Montoya had not been issued and Matter of M (a 1989 decision) was still the law.

The opposite is the case herein. When Respondent arranged her plea bargain, it carried no immigration consequences, and she unquestionably relied on that fact in arranging her plea. *See,* Respondents' Exhibits A and B. Still, according to DHS' theory, this disposition has now been retroactively converted into an immigration "death sentence." It is therefore urged that even to the extent that *Moosa* remains good law, it does not apply herein.

15

**C. IT WOULD VIOLATE DUE PROCESS TO APPLY THE NEW DEFINITION OF "CONVICTION" RETROACTIVELY WHERE THERE IS NO "RATIONAL LEGISLATIVE PURPOSE" FOR SUCH RETROACTIVE APPLICATION, AND WHERE MS. ROMO RELIED ON THE FACT THAT DEFERRED ADJUDICATION WAS NOT A CONVICTION.**

The principles urged herein are not new. As noted above, in *Matter of Soriano, supra*, LPRs who had conceded deportability when §212(c) relief was available were allowed to reopen proceedings and contest the charges. For the same reasons, Respondent asserts that it would constitute "mouse-trapping," and that it would violate Due Process, to apply the new definition of "conviction" to her.

It is true that Congress has the power to retroactively make specific conduct grounds for deportation, *St. Cyr, supra* at 2288 (emphasis added) ("Despite the dangers inherent in retroactive legislation, it is beyond dispute that, **within constitutional limits,** Congress has the power to enact laws with retrospective effect"). Those "constitutional limits" include the requirement that there be **separate justification for such retroactivity.** *Pension Benefit Guaranty Corp. v. Gray*, 467 U.S. 717,729-30 (1984) (internal citations omitted) (emphasis added):

> [R]etroactive legislation does have to meet a burden not faced by legislation that has only future effects. "It does not follow ... that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, **and the justifications for the latter may not suffice for the former.**" ... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose. [8]

---

[8] *See, Harisiades v. Shaughnessy,* 342 U.S. 580,593-96 (1952) where the Supreme Court rejected a constitutional challenge to legislation specifying that past membership in the Communist Party

16

No such separate justification exists herein. No rational legislative purpose is fulfilled by "mouse-trapping" an innocent man into accepting a plea bargain which is not a conviction and carries immigration consequences, and then retroactively changing the rules, such that she is later considered to have been convicted and subject to mandatory deportation, with no possibility of relief or hope of lawfully returning to the U.S. at a later date.

Because the reliance occurred at the guilt or innocence stage of the proceedings, ascribing such an intent to Congress would be even worse than in the cases where various Courts (including the Supreme Court, in *St. Cyr*), have refused to accept that Congress would "mouse-trap" immigrants into conceding deportability with the hope of obtaining §212(c) relief, only to withdraw such relief. *See, for example, LaGuerre v. Reno,* 164 F.3d 1035,1041 (7th Cir. 1998):

> The relevant rule is that statutes which change primary (out of court) duties, for example statutes that impose new tort liabilities, are applied prospectively, while statutes that change merely procedures are applied retroactively. ... The reasoning behind this distinction is that people are much more likely to rely on substantive than procedural law. But this implies that when it is the kind of procedural change that does

was grounds for deportation.. Prior legislation had made only present Communist Party membership grounds for deportation, and the Party had thereafter expelled non-citizen members. *Id.* 595-596:

> When the Communist Party as a matter of party strategy formally expelled alien members en masse, it destroyed any significance that discontinued membership might otherwise have as indication of change of heart by the individual. Congress may have believed that the party tactics threw upon the Government an almost impossible burden if it attempted to separate those who sincerely renounced Communist principles of force and violence from those who left the party the better to serve it.

17

> disturb reasonable expectations, the presumption in favor
> of retroactive application is reversed.  Suppose a person
> facing deportation conceded deportability in reliance on
> having a good shot at a waiver of deportability.  In that
> event, to abolish such waiver for his class of deportees
> after he had relied by forgoing a challenge to
> deportability would pull the rug out from under him.  And
> in that case we have held that the abolition would not
> apply to him, would be prospective only. ...

*See also, Jideonwo v. INS*, 224 F.3d 692 (7th Cir. 2000) [9] (alien
presented a cognizable due process claim by showing that AEDPA
§440(d), rescinding his eligibility for relief under §212(c) of the
Immigration Act, had impermissible retroactive effect when applied
to him, since he had relied on its availability at the time he pled
guilty to the underlying offense).  Similarly, in *Ubaldo-Figueroa,
supra,* at *7, the Court noted that the individual arranged a plea
bargain prior to IIRIRA, and in specific reliance on the fact that
it did not render him subject to deportation. The Court further
held that he was prejudiced by certain failings of the Immigration
Judge, because he had "two plausible challenges to his removal
order," including his claim "that the retroactive application of
IIRIRA §321 violated his right to due process." *Id.* at 14. [10]

For these reasons, Respondent asserts that this Court should not
ascribe to Congress an *intent* for the definition of "conviction" to
include persons such as she, who, when faced with serious charges,
decided that it was in her best interest to accept a plea bargain

---

[9]  *Jideonwo* was one of the cases examined by the Supreme Court
in *St. Cyr*, and cited as an example of exactly the type of
impermissible retroactivity at issue herein.   121 S.Ct. at 2292.

[10]  The Court's lengthy exposition of this issue rests largely
on cases such as *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*,
467 U.S. 717, 733 (1984), holding that statutory retroactivity
provisions must independently pass constitutional muster.

involving deferred adjudication, thereby avoiding immigration
problems, but who is now subject to mandatory and permanent
removal. This violates both procedural and substantive Due Process.

**D.  IT WOULD VIOLATE BOTH SUBSTANTIVE AND PROCEDURAL DUE PROCESS TO
CONCLUDE THAT MS. ROMO IS SUBJECT TO REMOVAL, AND INELIGIBLE FOR
ANY FORM OF DISCRETIONARY RELIEF.**

Although the BIA cannot independently determine that a statute
violates Due Process, as indicated above, it may consider such
possible constitutional violations in searching for a construction
of the statute that does not raise Due Process concerns.  Apart
from the reasoning of *Ubaldo-Figueroa, supra,* Ms. Romo asserts that
the retroactive application to her of the new definition of
"conviction" would, indeed, raise serious constitutional questions.

**1.  UNDER THE LAW IN EFFECT WHEN SHE PLED NO CONTEST, IN
EXCHANGE FOR DEFERRED ADJUDICATION, THIS DISPOSITION
CARRIED NO IMMIGRATION CONSEQUENCES, AND IT VIOLATES
SUBSTANTIVE DUE PROCESS TO APPLY RETROACTIVELY A NEW
STATUTE UNDER WHICH REMOVAL IS A MANDATORY CONSEQUENCE OF
SUCH A DISPOSITION.**

As a lawful permanent resident, Respondent has a fundamental
liberty interest in being able to live and work in the United
States, and in remaining here with her family. *See, Landon v.
Plasencia,* 459 U.S. 21,34 (1982), citing *Bridges v. Wixon,* 326 U.S.
135,154 (1945); *Moore v. City of East Cleveland*, 431 U.S. 494,499
(1977), and *Stanley v. Illinois*, 405 U.S. 645, 651 (1972):

> Plasencia's interest here is, without question, a weighty
> one.  She stands to lose the right "to stay and live and
> work in this land of freedom," ...  Further, she may lose
> the right to rejoin her immediate family, a right that
> ranks high among the interests of the individual. ...

In *Placencia,* the Court further noted as follows, *id.:*

> The government's interest in efficient administration of
> the immigration laws at the border also is weighty.
> Further, it must weigh heavily in the balance that
> control over matters of immigration is a sovereign
> prerogative, largely within the control of the executive
> and the legislature.

The Court resolved the seeming tension between these principles as
follows, *id.*, at 34-35:

> The role of the judiciary is limited to determining
> whether the procedures meet the essential standard of
> fairness under the Due Process Clause and does not extend
> to imposing procedures that merely displace congressional
> choices of policy.

The Court then applied the balancing test of *Mathews v. Eldridge*,
424 U.S. 319, 334-335 (1976), and concluded that the exclusion
procedures were not *per se* constitutionally inadequate, but that
there was a question as to whether or not the procedures actually
received had been adequate, and remanded for further proceedings.
In other words, the Court did *not* find that Congress' plenary
control over immigration diminished the fundamental right involved.
To the contrary, the Court analyzed the case as one involving
Procedural Due Process, to which INS conceded she was entitled.
There was no claim of any Substantive Due Process violation.

Nonetheless, the existence of this fundamental right, which, it
must be emphasized, is enjoyed only by those who have a *right* to
reside in this country, (i.e., by lawful permanent residents),
triggers a "compelling state interest" analysis in determining
whether a given abridgement passes Substantive Due Process muster.
*Washington v. Glucksberg,* 521 U.S. 702,721 (1997):

> As we stated recently in [*City of Boerne v.*] *Flores,* the
> Fourteenth Amendment "forbids the government to infringe
> ... 'fundamental' liberty interests *at all,* no matter

20

what process is provided, unless the infringement is
narrowly tailored to serve a compelling state interest."
507 U.S., at 302, 113 S.Ct., at 1447.

A statute may violate Substantive Due Process either on its face,
or, (as is the case herein), as applied in a particular situation.
*See, Troxel v. Granville*, 120 S.Ct. 2054 (2000) (As applied,
Washington statute providing that any person may petition court *for*
visitation at any time, and that court may order visitation rights
for any person when visitation may serve best interest of child,
violated substantive due process rights of mother). *See also,*
*Washington v. Glucksberg, supra* at 720 (The Fourteenth Amendment's
Due Process Clause has a substantive component that "provides
heightened protection against government interference with certain
fundamental rights and liberty interests," including parents'
fundamental right to make decisions concerning the care, custody,
and control of their children); *M.L.B. v. S.L.J.*, 117 S.Ct. 555,557
(1996) ("The interest of parents in their relationship with their
children is sufficiently fundamental to come within the finite
class of liberty interests protected by the Fourteenth Amendment").

This analysis is underscored by the recent decision of the Supreme
Court in *Zadvydas v. Davis, supra*.  Rather than a fundamental
right, *Zadvydas* involved a liberty interest, to wit, the indefinite
detention of aliens under final deportation orders which could not
be effectuated in a reasonable period of time. But by applying
Substantive Due Process analysis to this issue, the Court
reaffirmed the continued vitality of that doctrine, as applied to
lawful permanent residents. [11]

----

[11]  In *Reno v. Flores,* 507 U.S. 292 (1993), the Court held that
a regulation permitting detained juvenile aliens to be released
only to their parents, close relatives, or legal guardians, except
in unusual and compelling circumstances, did not facially violate

21

Applying Substantive Due Process analysis to the case at bar, it is respectfully submitted that §1101(a)(48) is not narrowly tailored to serve a compelling state interest, and that as applied herein, it violates Substantive Due Process. Respondent has been a lawful permanent resident since 1982, and has extensive family ties in this country: lawful permanent residents, and United States citizens, who depend on her. Although her attorney considered that she had a viable defense, in order to avoid the risks of trial, she accepted a plea bargain, and was placed on probation, without adjudication of guilt, pursuant to Article 42.12, Section 5(a), Texas Code of Criminal Procedure. No legitimate interest, let alone a "compelling" one, is served by a statute or combination of statutes which mandate the deportation of a lawful permanent resident under these circumstances.

### 2. RETROACTIVE APPLICATION ALSO OFFENDS PROCEDURAL DUE PROCESS, BECAUSE IT DEPRIVED RESPONDENT OF "FAIR NOTICE" OF THE MAGNITUDE OF THE PENALTY THAT MIGHT BE IMPOSED AS A RESULT OF HER PLEA.

---

substantive due process. In reaching that conclusion, the Court noted, *id.* at 304, that "the child's fundamental rights must not be impaired." However, the Court concluded that there was, *in that case,* no such impairment. *Id.* at 302:

> [A]s we have said elsewhere, "juveniles, unlike adults, are always in some form of custody,' *Schall,* 467 U.S., at 265, 104 S.Ct., at 2410, and where the custody of the parent or legal guardian fails, the government may (indeed, we have said *must*) either exercise custody itself or appoint someone else to do so.

Since "child-care institutions [are] operated by the State in the exercise of its *parens patriae* authority," *id.* at 304, and the Court found the same principle applicable to juveniles detained by INS, the Court concluded that the juveniles could not assert a "fundamental right" to be free from custody, nor make any particular demands regarding that custody.

22

The same result is reached through another series of Supreme Court cases, involving "fair notice." To apply *Punu* and *Moosa* herein would retroactively convert a disposition which, at the time of her plea bargain, carried no immigration consequences at all, into one which requires mandatory deportation.  Although not "punishment" for a criminal offense, deportation has long been recognized as a "penalty."   *See, Reno v. American-Arab Anti Discrimination Committee,* 525 U.S. 471, 497-98 (1999), Justice Ginsberg, concurring in Part I and the result:

> As this Court has long recognized, "[t]hat deportation is a penalty - at times a most serious one - cannot be doubted." *Bridges,* 326 U.S., at 154, 65 S.Ct. 1443; see also *ibid.*  (Deportation places "the liberty of an individual ... at stake....  Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom.")

Deportation then becomes an additional penalty, retroactively attached to the "criminal offense," by virtue of an amendment to the statute which can reasonably be interpreted otherwise, to wit, as applying only to dispositions which were, prior to enactment, "convictions" for immigration (or other) purposes.  This occurs even though, under state law, there is no conviction, and never will be one, if Respondent successfully completes her probation.

Therefore, **as applied herein,** §1101(a)(48)(A) violates the Due Process Clause, in that it retroactively makes qualitative changes in the penalty imposed, in a wholly unexpected manner. *See,* Nancy Morawetz, "Rethinking Retroactive Deportation Laws and the Due Process Clause," NYU Law Rev., Vol 73, No. 1, April 1998.  *See also, Arce v. Walker,* 139 F.3d 329,333-34 (2nd Cir. 1998): [12]

---

[12]   This article was cited in *Ubaldo-Figueroa, supra* at *38.

> [T]he Due Process Clause protects against restraints or
> conditions of confinement that "exceed[ ] the sentence in
> ... an unexpected manner." *Sandin,* 515 U.S. at 484, 115
> S.Ct. at 2300; *see id.* at 479 n. 4, 115 S.Ct. at 2297 n.
> 4 (observing that proscribed conditions of confinement
> must be "qualitatively different from the punishment
> characteristically suffered by a person convicted of
> crime, and [have] stigmatizing consequences." (citation
> and internal quotation marks omitted)); *see, e.g., Vitek
> v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63
> L.Ed.2d 552 (1980) (holding that "involuntary commitment
> to a mental hospital is not within the range of
> conditions of confinement to which a prison sentence
> subjects an individual"); *Washington v. Harper,* 494 U.S.
> 210, 221-22, 110 S.Ct. 1028, 1036-37, 108 L.Ed.2d 178
> (1990) (holding that inmate has a liberty interest under
> the Due Process Clause to refuse the involuntary
> administration of psychotropic drugs).

Because they derive from the Due Process, rather than the Ex Post
Facto Clause of the Constitution, these protections exist even
though deportation is a civil penalty, rather than criminal
punishment. As the Supreme Court held in *BMW of North America v.
Gore,* 517 U.S. 559,574 (1996) (footnote 22 in original):

> Elementary notions of fairness enshrined in this Court's
> constitutional jurisprudence dictate that a person
> receive fair notice not only of the conduct that will
> subject him to punishment but also of the severity of the
> penalty that a State may impose. FN22
>
> FN22. See *Miller v. Florida,* 482 U.S. 423, 107 S.Ct.
> 2446, 96 L.Ed.2d 351 (1987) (*Ex Post Facto* Clause
> violated by retroactive imposition of revised sentencing
> guidelines that provided longer sentence for defendant's
> crime); *Bouie v. City of Columbia,* 378 U.S. 347, 84
> S.Ct. 1697, 12 L.Ed.2d 894 (1964) (retroactive
> application of new construction of statute violated due
> process); *id.,* at 350-355, 84 S.Ct., at 1701-1703
> (citing cases); *Lankford v. Idaho,* 500 U.S. 110, 111
> S.Ct. 1723, 114 L.Ed.2d 173 (1991) (due process violated
> because defendant and his counsel did not have adequate
> notice that judge might impose death sentence). The

24

> strict constitutional safeguards afforded to criminal
> defendants are not applicable to civil cases, but the
> basic protection against "judgments without notice"
> afforded by the Due Process Clause, *Shaffer v. Heitner,*
> 433 U.S. 186, 217, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683
> (1977) (STEVENS, J., concurring in judgment), is
> implicated by civil *penalties.*

For a lawful permanent resident such as Respondent, there can be
not question but that deportation is a "civil *penalt[y]*" imposed as
a result of her criminal "conviction." It therefore violates Due
Process because it imposes a "civil penalt[y]" without prior
notice, as in *Shaffer v. Heitner, supra.* And, as in *BNW of North
America v. Gore, supra*, it confounds the "[e]lementary notions of
fairness enshrined in this Court's constitutional jurisprudence"
which "dictate that a person receive fair notice not only of the
conduct that will subject him to punishment but also of the
severity of the penalty that a State may impose." *See also,
Jideonwo v. INS, supra,* at 697: [13]

> The Supreme Court has held that applying a law
> retroactively such that it results in "manifest
> injustice" violates the Due Process Clause. *See Bradley
> v. School Bd. of City of Richmond*, 416 U.S. 696, 716 ...
> (1974). Manifest injustice may occur where a new law
> changes existing rights or imposes unanticipated
> obligations on a party without providing appropriate
> notice. *See id.* at 720,... *see also Landgraf v. USI
> Film Prods.*, 511 U.S. 244, 266 ... (1994) ("The Due
> Process Clause also protects the interests in fair notice
> and repose that may be compromised by retroactive
> legislation."). Retrospective changes in INS procedure
> have been found to violate the due process rights of
> affected aliens. For example, in *Accardi v. Shaughnessy*,
> the Supreme Court held that retroactively changing a
> procedure for granting relief from deportation from one
> of discretion to one of predetermined results violated

---

[13] *Jideonwo* was cited with approval in *St. Cyr, supra* at 2292.

the Due Process Clause where it took away a procedure to
which the alien-petitioner previously had a right
prescribed by statute. 347 U.S. 260 ... (1954); *see also*
*Tasios v. Reno*, 204 F.3d 544, 552 (4th Cir.2000).
Similarly, in *Reyes-Hernandez*, we held that retroactive
application of § 440(d) to an alien who had conceded a
colorable defense to deportability in reliance on being
considered for § 212(c) relief violated the alien's due
process rights. 89 F.3d at 493 ...

*See also, Griffon v. USDHHS*, 802 F.2d 146 (5th Cir. 1986) (agency
cannot construe statute such that civil fines may be imposed for
conduct which predated statute).

It can also be argued that converting a guilty plea into automatic
grounds for removal has an *ex post facto* effect. *See, Knuck v.
Wainwright,* 759 F.2d 856,859 (11th Cir. 1985):

In *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964,
67 L.Ed.2d 17 (1981), dealing with a subsequent amendment
to the same Florida statute at issue here, the Supreme
Court held that two critical elements must be present for
a criminal or penal law to be ex post facto: the statute
must be retrospective, and it must be disadvantageous to
the offender. The first element is met because Knuck's
offense occurred in 1975 while the change in
interpretation of the law did not occur until 1979.
Second, Knuck is disadvantaged by the additional year he
had to spend in prison and would have to spend on
probation. The Court in *Weaver* observed that "a law need
not impair a 'vested right' to violate the *ex post facto*
prohibition." *Id.* "Critical to relief under the *Ex Post
Facto* Clause is not an individual's right to less
punishment, but the lack of fair notice...." *Id.* at 30,
101 S.Ct. at 965.

Having found an *ex post facto* violation, the Court did not reach
the claim that the change in the interpretation also violated Due
Process. *Id.*. However, this holding also supports Respondent's
claim that the retroactive application of a statute can, and in her

26

case does, violate Due Process, and might also be viewed as being an unconstitutional *ex post facto* law.

Further, Respondent urges that, as previously shown, an interpretation does exist which avoids these serious constitutional concerns. Under cases such as *Webster,* and *Cardoza-Fonseca*, the Court is therefore bound to adopt this alternative construction.

### E.  AN ALTERNATE CONSTRUCTION WOULD CREATE VAGUENESS PROBLEMS.

In the alternative, it is urged that, applying IIRIRA §322(c) herein would cause the statute to be void for vagueness, under *Jordan v. DeGeorge,* 341 U.S. 223, 230-31 (1951):

> This Court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law.... It should be emphasized that this statute does not declare certain conduct to be criminal. Its function is to apprise aliens of the consequences which follow after conviction and sentence of the requisite two crimes.

> Despite the fact that this is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case. We do this in view of the grave nature of deportation.  The Court has stated that 'deportation is a drastic measure and at times the equivalent of banishment or exile * * *. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty.' ...  We shall, therefore, test this statute under the established criteria of the 'void for vagueness' doctrine.

If a statute designed to "apprise aliens of the consequences which follow after conviction," can be void for vagueness, and therefore violate Due Process, one which retroactively turns a plea-bargained procedure into a conviction for immigration purposes is far worse.

27

**F.  IN THE FURTHER ALTERNATIVE, RESPONDENT MUST BE ALLOWED TO APPLY FOR RELIEF UNDER §212(c) OF THE ACT, UNDER *INS v. ST. CYR, SUPRA*.**

In the alternative, the reasoning of *St. Cyr* mandates that Respondent be allowed to apply for relief under §212(c) of the Act.

As seen above, *St Cyr.* was about retroactivity, not reliance.  The *possibility* of reliance entered only after the Court found that the retroactivity language could sustain more than one interpretation. At that point, the Court proceeded to the second step of the *Landgraf* analysis, determining whether the statute carried genuine retroactive effect.  In this context, the Court considered that an immigrant who relied on the prior state of the law could suffer adverse consequences. But the Court did not limit its ruling to such cases.  Rather, once it found that the statute would have genuine retroactive effect (in some cases), the Court concluded that it could not be applied retroactively.  Period.

A contrary result would be incredibly burdensome on the Courts and administrative agencies. It would require a mini-trial, in each case, to determine whether, as applied to the individual at bar, the statute could be applied retroactively. This is not what *Landgraf* and its progeny contemplates.  For example, in *Landgraf*, the Court stated the issue, and its holding, as follows, *id* at 247:

> The Civil Rights Act of 1991 (1991 Act or Act) creates a right to recover compensatory and punitive damages for certain violations of Title VII of the Civil Rights Act of 1964. ...  The Act further provides that any party may demand a trial by jury if such damages are sought... We granted certiorari to decide whether these provisions apply to a Title VII case that was pending on appeal when the statute was enacted.  We hold that they do not.

This language covered all cases  pending on appeal when the statute

was enacted.  In *St. Cyr*, the Court considered whether retroactive application would have "genuine retroactive effect." as applied to an immigrant who was, at the time of his plea, eligible for §212(c) relief. In so doing, the Court made the following observation *Id.* at 2290, (footnote 44 in original)(emphasis added):

> The presumption against retroactive application of ambiguous statutory provisions, buttressed by "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien," INS v. Cardoza-Fonseca, 480 U.S. 421, 449... (1987), forecloses the conclusion that, in enacting § 304(b), "Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." [FN44] ...
>
> FN44. **The legislative history is significant because, despite its comprehensive character, it contains no evidence that Congress specifically considered the question of the applicability of IIRIRA § 304(b) to pre-IIRIRA convictions.**

Congress' failure to specifically consider this question precludes application of IIRIRA §304(b) to pre-IIRIRA convictions.  So §212(c) relief remains available to LPRs with such convictions, regardless of whether they resulted from guilty pleas, or following trial.  As explained in *Landgraf,* at 272-73 (emphasis added):

> [W]hile the constitutional impediments to retroactive civil legislation are now modest, prospectivity remains the appropriate default rule.  Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. **Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits.**

29

In other words, where, as here, there is latent ambiguity in the statute, and where, as here, there is no indication that Congress affirmatively considered the "potential unfairness" of retroactive application of a statute, that statute cannot be retroactively applied, regardless of whether such application would, in an individual case, have "genuine retroactive effect." This is also mandated by the principle "'of construing any lingering ambiguities in deportation statutes in favor of the alien,'" *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987), quoted in *St. Cyr, supra* at 247.

## V.   CONCLUSION

In conclusion, it is urged that proceedings be terminated, on the grounds that:

1.   IIRIRA §322(c) can sustain more than one interpretation, without reading it out of the statute.  Specifically, it can reasonably sustain the interpretation, consistent with the plain language thereof, that it applies only to dispositions which **were** considered to be "convictions" prior to the enactment of IIRIRA. Read this way, it would still apply, retroactively, to dispositions of criminal cases which were, prior to IIRIRA, considered to be *convictions*, regardless of when the *sentence* was imposed;

2.   An alternate construction would, under *INS v. St. Cyr*, be impermissible, in that it would violate Due Process, for a variety of reasons.  The legislative history does not demonstrate that Congress affirmatively considered the potential unfairness of retroactive application of the new definition to criminal dispositions which were not "convictions" prior to the enactment of IIRIRA, and there is no compelling state interest which would be served thereby.  Furthermore, it would increase the penalty, without prior notice, in violation of Due Process, and quite

30

possibly, constitute an *ex post facto* violation as well.

3.  An alternate construction would also render the statute void for vagueness, in that it would not adequately "apprise aliens of the consequences which follow" the acceptance of a plea bargain for deferred adjudication, as required by *Jordan v. DeGeorge, supra.*

In the alternative, it is urged that, for the same reasons, Respondent be given an opportunity to apply for §212(c) relief.

Respectfully Submitted,

Lisa S. Brodyaga,
REFUGIO DEL RIO GRANDE
17891 Landrum Park Rd.
San Benito, TX 78586
(956) 421-3226

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed to DHS District Counsel, P.O. Box 1711, Harlingen, Texas 78551, this 2nd day of October, 2003.

_____

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BEFORE THE BOARD OF IMMIGRATION APPEALS**

In re

**MARIA DE JESUS CASTILLO-ZAPATA DE ROMO**
**A37 837 447**

**EXHIBIT "B" IN SUPPORT OF**

**RESPONDENT'S BRIEF ON APPEAL, REQUEST FOR THREE-MEMBER PANEL,**
**AND MOTION TO TERMINATE**

CAUSE NO. 93-012-3041

| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| v. | ) | 24ᵗʰ JUDICIAL DISTRICT |
| | ) | |
| MARIA DE JESUS ROMO | ) | REFUGIO COUNTY, TEXAS |

DECLARATION OF MARIA DE JESUS ROMO IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS AND
MOTION FOR MODIFICATION OF JUDGMENT

I, Maria De Jesus Romo, hereby declare under penalty of perjury as
follows:

I am a native and citizen of Mexico. I became a lawful permanent
resident of the United States on November 4, 1982, at the age of
eighteen. At that time, I came with my parents and siblings. I am
now married, and with my husband, also an permanent resident, I
have three children born in the United States. Apart from the
proceedings at issue herein, I have no criminal record. I only
went through the fourth grade of school, in Mexico, and have
devoted myself to my family.

On or about August 10, 1993, I was arrested, with my sister
Guadalupe Hernandez, when marijuana was discovered secreted in the
car in which I was a passenger. The car belonged to Jesus Flores,
a friend of my sister. Mr. Flores was not in the vehicle at the
time. On the day in question, my sister had asked me to accompany
her to Houston. I asked my husband, who was against it, and he said
"no." So I told her "no." She also asked our other sister, who
also turned her down. But that afternoon, after my husband had
gone to work, she came by the house, and made another attempt to
convince me. I told her that I did not have any money, and she
said that did not matter, as we were just going to go for the
evening, and then come right back. I noticed that she was driving
a different car, and asked whose it was. She said it belonged to
a friend. I asked where her car was, and she said she had left it
at the house. But it did not occur to me that there was anything
wrong, and I did not ask any more questions about it. It all
happened too fast. Since I do not have a driver's license, and
rarely get out of the house, I finally agreed, essentially on a
whim. I took a change of clothing, and the children, and we left.
I did not even leave a note for my husband.

In Refugio, we were pulled over by the police because my sister did
not have her seat belt fastened. The police had a drug-sniffing
canine, and as soon as they opened the car door, the dog signaled

that there was something in the car.  Apparently, they found
marijuana secreted somewhere in the vehicle.  This was the first I
knew, or even suspected, that there were drugs in the car.  My
sister and I were both arrested.  Her daughter, who was about
seventeen, was taken to a hotel, and left with my children.  The
police called my husband.  He had come home, and discovered that we
were gone.  He was very angry, both with me, and with my sister.

My husband arranged to get me out on bond.  He also found an
attorney to represent me, Ricardo Alanis.  After we had made a
couple of trips to Refugio, Mr. Alanis negotiated a plea bargain,
and recommended that I take it. I had never been in trouble before,
and did not know how the system worked.  I do not even remember him
telling me that I could go to trial. I trusted the attorney, and
did what he said. He assured me that if I complied with the terms
of my probation, the charges would be dismissed, my record would be
clean, and that I would not have any more problems as a result of
the incident.  He did not warn me that Congress could make changes
to the  immigration  law  which  could  make  this  grounds  for
deportation, and that such changes could be made retroactive.  Nor
did he advise me that Congress was in the process of making such
changes.  Even though he knew that I was completely innocent, Mr.
Alanis advised me to accept the plea bargain offered by the
District Attorney.  I believed what he had told me, and agreed to
say that I was guilty, even though we both knew that was not true,
just to be certain that I did not have any future problems.

Therefore, on May 14, 1996, I went to Court, with my attorney.  I
entered a plea of guilty, and was placed on probation for ten
years. To date I have fulfilled all the conditions of my probation.
At one point, when my sister and I reported to the Probation
Office, the Officer asked my sister how much I was to be paid for
my role in the offense.  My sister replied: "Nothing, because she
didn't know the drugs were there."  I believe that the Officer made
a note of this comment in her file.

In August of 1997, when I went to report to the Probation Officer,
agents from INS were there.  I was very surprised, because the
attorney had assured me that I would not have any problems, so long
as I fulfilled my probation requirements.  But there was nothing I
could do. The INS agents originally told me that they were going to
send me to Mexico, but I protested, because of my children.
Eventually, they took me to Harlingen, where they asked me a lot of
questions, took away my green card, and gave me a "permiso."  They
told me that I would get a letter in the mail, setting a date for
me to go to an Immigration Judge.  But years went by, with no
letter.  I kept reporting to Immigration, and they kept extending

2

my "permiso." Eventually, I received the appointment, and after a couple of appearances with the Immigration Judge, he ordered my deportation to Mexico. My attorney filed an appeal, but told me that in all likelihood, we would lose the appeal, and unless I went back to the Court in Refugio, to get to Judgment changed, I would in all likelihood be deported, because of the laws that were passed in September of 1996.

The foregoing has been read and explained to me in Spanish by Attorney Thelma Garcia, and is true and correct to the best of my knowledge and belief.

Further Declarant sayeth not.

*Maria de Jesus Romo*

Maria De Jesus Romo
July 7, 2003

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


MARIA DE JESUS CASTILLO DE ROMO          )

v.                                       )

TOM RIDGE, and MARC MOORE,               )
     U.S. DEPT OF HOMELAND SECURITY, and )
THE UNITED STATES OF AMERICA.            )
_____)


EXHIBIT "D" IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS

CAUSE NO. 93-012-3041

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| v. | ) | 24th JUDICIAL DISTRICT |
| | ) | |
| MARIA DE JESUS ROMO | ) | REFUGIO COUNTY, TEXAS |

### DECLARATION OF GUADALUPE HERNANDEZ IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR MODIFICATION OF JUDGMENT

I, Guadalupe C. Hernandez, hereby declare under penalty of perjury as follows:

I am a native and citizen of United States, and reside in McAllen, Texas.  I am the sister of Maria De Jesus Romo.

On or about August 10, 1993, I invited my sister Maria De Jesus Romo to accompany me to Houston.  We went in a car belonging to an acquaintance, Jesus Flores. He had asked me to drive it to Houston, and I made the mistake of agreeing to do so.  He gave me money for the gas. My husband was in New York, and I did not want to go alone, so I asked by sister to accompany me. At first she did not want to go, but I finally convinced her.

After we were stopped in Refugio, and marijuana was found in the car, we were arrested.  My brother-in-law, Adelmiro Romo, hired Ricardo Alanis to represent us.  I told Mr. Alanis that we were both innocent, and that I was going to tell the authorities that Mr. Flores was responsible for the drugs, but he did not want me to do so.  I kept insisting, and he kept saying no, that we should both plead guilty, so that the matter would not drag out. Eventually, I agreed.  He was the attorney, and I believed he was trying to do what was in our best interest.  After we went to Court, and pled guilty, my sister and I reported to the Probation Office.  The Officer asked me how much my sister was going to be paid, and I told her "nothing, because she didn't know."

I now feel very badly that I did not go against my attorney's advice, and report Jesus Flores.  I am a United States citizen, so the proceedings have not affected me the way they have my sister. At the time, we did not think they would have immigration consequences for her, either, but now that the law has changed, she is in danger of being deported, and I feel responsible.  I believe that if I had reported Mr. Flores, it would have come to light that she was innocent, and she would not have been prosecuted.

The foregoing has been read and explained to me in Spanish by Attorney Lisa Brodyaga, and is true and correct to the best of my knowledge and belief.

Further Declarant sayeth not.


_Guadalupe Hernandez_
Guadalupe Hernandez
July 22, 2003



# TEXAS
## DEPARTMENT OF PUBLIC SAFETY
### DRIVER LICENSE

CLASS: C    DL:   12683227
DOB: 06-02-53    HT: 5-00
EXPIRES: 06-02-06    EYES: BRN
REST:    SEX: F
END:

HERNANDEZ, GUADALUPE C
3421 MELBA
MC ALLEN TX 78501

0016013781 4